IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Criminal No. 5:19-CR-301 (DNH) |
| **v.** | Government's Sentencing Memorandum |
| **KYLE M. LEEPER,**<br>     **also known as "Bud," "Freddy,"**<br>     **and "Shorty," _et al._,** | |
| **Defendant.** | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files its memorandum addressing the sentencing of defendant Kyle M. Leeper, scheduled for Thursday, September 22, 2022, at 12:00 p.m., in Utica, New York.[1]

**A.      Introduction**

On May 12, 2022, Leeper pled guilty to three of five counts charged in a third superseding indictment, namely: Count One, charging Leeper with intentionally killing another while engaging in a controlled substance offense, in violation of 21 U.S.C. § 848(e)(1)(A); Count Two, charging Leeper with conspiring to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, with that violation involving 50 grams or more of

---

[1] This Court's Uniform Presentence Order requires that the parties file their sentencing memoranda "[n]o later than twenty-one (21) days prior to sentencing" and further provides that the memoranda should include, among other things, "objections to the presentence report which could not be resolved." Government counsel communicated by letter to the Probation Office (with a copy to defense counsel) its objections to the initial draft of the presentence investigation report but to date, there has been no final report filed. As a result, the government does not now know which "objections [if any] . . . could not be resolved." If, when the final presentence investigation report is filed, there remain unresolved objections, the government will address them in a supplemental filing.

actual methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A); and Count Five charging Leeper with possessing a firearm and ammunition as a convicted felon, in violation 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Leeper pled guilty pursuant to a Fed. R. Crim. P. 11(c)(1)(C) plea agreement, which provided for an agreed-upon imprisonment range of 25 to 40 years.  Dkt. #251.[2]

The government urges the Court sentence Leeper to 40-year terms of imprisonment on each of Counts One and Two, and a five-year term on Count Five, all to run concurrently, followed by a life term of supervised release.  As explained below, there are at least five reasons why this Court should impose a prison term at the top end of the agreed-upon range: (1) doing so would be most consistent with the Federal Sentencing Guidelines; (2) Leeper's cruel and gratuitous abduction and murder of a helpless victim demands severe punishment; (3) Leeper's disturbing criminal history demonstrates his dangerousness; (4) Leeper's criminal conduct in this case in addition to the kidnapping and murder merits significant punishment in its own right; and (5) Leeper's disingenuous statements to the Probation Office demonstrate that he has no meaningful remorse for his criminal conduct.

**B.**     **Statutory and Guidelines Sentencing Ranges**

**1.**     **Statutory Sentencing Provisions**

Leeper's Count One murder conviction carries a 20-year statutory minimum imprisonment term and, because the government chose not to seek the death penalty, a maximum term of life. 21 U.S.C. § 841(e)(1)(A); Leeper PSR ¶ 112.  Leeper's Count Two methamphetamine-trafficking conspiracy conviction carries a ten-year statutory minimum term and a maximum term of life, as

---

[2] This Court reserved decision on whether to accept the plea agreement until sentencing.  Transcript of Leeper change of plea at 23.  *See* Fed. R. Crim. P. 11(c)(3)(A) ("To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.").

well as a supervised release term of five years to life.  21 U.S.C. §§ 846 and 841(b)(1)(A)(viii); Leeper PSR ¶ 112.  Leeper's Count Five felon-in-possession conviction carries a statutory maximum ten-year term of imprisonment.  18 U.S.C. § 924(a)(2) (2019); Leeper PSR ¶ 112.[3]

### 2. Guidelines Sentencing Provisions

Leeper's three counts of conviction form two "groups": Group One consists of the Count One murder conviction, which does not join the other convictions because it involved a different victim, namely Robert Chavez, the murder victim, and a different harm.  PSR ¶ 51.  Group Two consists of the Count Two methamphetamine-trafficking conspiracy conviction and the Count Five felon-in-possession conviction.  These latter two counts join in a single "group of closely related counts" under U.S.S.G. § 3D1.2(c) because Count Five "embodies conduct [possession of a firearm] that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Count Two, specifically U.S.S.G. § 2D1.1(b)(1), which provides for a two-level increase in drug cases "[i]f a dangerous weapon (including a firearm) was possessed."  *See* PSR ¶ 51.

**Group One**: The base offense level for Group One is 43 under U.S.S.G. § 2A1.1 (First Degree Murder).  *See* PSR ¶ 52.  This offense level is increased two levels under U.S.S.G. § 3A1.3 because Leeper restrained the victim, Robert Chavez, with plastic zip ties on his wrists and ankles

---

[3] Title 18, United States Code, Section 924, the penalty provision applicable to Title 18 firearms offenses, was amended by the Bipartisan Safer Communities Act, PL 117-159, June 25, 2022, 136 Stat 1313.  Among other things, this recent legislation moved the penalty for a violation of the felon-in-possession prohibition, 18 U.S.C. § 922(g)(1), from 18 U.S.C. § 924(a)(2) to 18 U.S.C. § 924(a)(8) and increased the maximum imprisonment term to 15 years.  Because this law was enacted after Leeper committed his violation of 18 U.S.C. § 922(g)(1), the *Ex Post Facto* Clause bars application of the increased penalty.  *See, e.g.*, *Weaver v. Graham*, 450 U.S. 24, 30 (1981) (explaining that the *Ex Post Facto* Clause "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred").

before killing him, *see* PSR ¶¶ 32-34, 54, and two levels under U.S.S.G. § 3B1.1(c) because Leeper "was an organizer, leader, manager, or supervisor in" the Chavez murder with respect to co-defendant Ramon Nieves Cotto.  Leeper made the decision to abduct and kill Chavez and directed Nieves Cotto to purchase the zip ties that Leeper used to bind Chavez.  PSR ¶¶ 31-33.  As a result, the adjusted offense level for Group One is **47**.

**Group Two**: The offense level for the multi-count Group Two is determined pursuant to the instruction in U.S.S.G. § 3D1.3(a), which provides that "the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group."  *See* PSR ¶ 58.  Because the most serious of the two counts in Group Two is the Count Two methamphetamine-trafficking conspiracy, the applicable Chapter Two guideline is U.S.S.G. § 2X1.1(a), which directs the use in a conspiracy case of "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."  The guideline for the substantive drug-trafficking offense, U.S.S.G. § 2D1.1, in turn, contains a "cross reference" that provides that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder) or §2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline."  U.S.S.G. § 2D1.1(d)(1).[4]  Here, because Leeper's murder of Chavez would qualify as first-degree

---

[4] The fact that the guideline applicable to Count Two (U.S.S.G. § 2D1.1) cross-refers to the guideline applicable to Count One (U.S.S.G. § 2A1.1) does not result in these two groups joining in a single group of closely related counts.  *See* U.S.S.G. § 3D1.2, cmt. n.5 ("A cross reference to another offense guideline does not constitute 'a specific offense characteristic ... or other adjustment' within the meaning of subsection (c).").

murder under 18 U.S.C. § 1111 had it occurred within the territorial or maritime jurisdiction of the United States,[5] U.S.S.G. § 2A1.1, which has a base offense level of 43, applies.  As was the case above for Group One, two different two-level upward adjustments apply, one for restraint of the victim, U.S.S.G. § 3A1.3, and one for an aggravating role, U.S.S.G. § 3B1.1(c).  This results in an adjusted offense level of **47**.

Under U.S.S.G. § 3D1.4(a), each of Group One and Group Two are assigned one "unit," which, when combined, results in a two-level increase in the combined adjusted offense level to level 49.  If this Court credits Leeper two levels downward for acceptance of responsibility under U.S.S.G. § 3E1.1(a), which the government recommends pursuant to its plea agreement with Leeper, Dkt. #251 at ¶ 7, his total adjusted offense level will be **47**.[6]  The guidelines direct that "[a]n offense level of more than 43 is to be treated as an offense level of 43."  U.S.S.G., Chapter 5, cmt. n.2.  *See* PSR ¶ 73.

The presentence investigation report assigns a criminal history score of 6 to Leeper, resulting in his placement in criminal history category III.  PSR ¶ 83.  The government has no opposition to these calculations.

---

[5] In relevant part, 18 U.S.C. § 1111(a) provides as follows: "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by  . . . willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any  . . . kidnapping . . . is murder in the first degree."  "[T]he term 'malice aforethought' means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life."  2A Fed. Jury Prac. & Instr. § 45:16 (6th ed)  Leeper's killing of Chavez, which was willful, deliberate, and premeditated, and occurred in the perpetration of a kidnapping, qualifies as first-degree murder under 18 U.S.C. § 1111(a).

[6] The government will not move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b).  Leeper first notified the government that he intended to plead guilty less than a week before trial was scheduled to begin.

An offense level of **43** and a criminal history category of **III** results in an advisory guidelines sentence of **life imprisonment**.  As noted above, however, the Rule 11(c)(1)(C) plea agreement caps Leeper's imprisonment term at 40 years.

**C.    Argument**

For reasons described below, the government urges the Court to sentence Leeper to a 40-year term of imprisonment—the upper end of the agreed-upon range—followed by a life term of supervised release.

> **1.    A 40-Year Prison Term Would Be Most Consistent with the Federal Sentencing Guidelines.**

As explained above and in the presentence investigation report, the federal sentencing guidelines recommend a life term of imprisonment for Leeper.  This recommended life sentence results from the severity of Leeper's offense conduct and would be the advisory guidelines sentence even without consideration of Leeper's criminal history.[7]  Although the plea agreement here limits Leeper's maximum prison sentence to no more than 40 years, a 40-year term would most closely approximate a life sentence.  At sentencing, Leeper will be 39 years old.  He has been in federal custody on charges in this case since August 21, 2019, meaning that he may be eligible for approximately three years and one month of "time served" credit.  *See* 18 U.S.C. § 3585(b).  Thus, a 40-year imprisonment term will result in Leeper's incarceration until he is in his mid-70's, minus any good time credit he earns up to approximately 15% of his total sentence.  *See* 18 U.S.C. § 3624(b)(1).  Although a 40-year term may enable Leeper to gain release from custody at some point, it will most closely approximate what the guidelines recommend.

---

[7] The sentencing guidelines provide for a life term of imprisonment for any offender whose offense level is 43, even one with a criminal history category of I.

**2.    The Manner in Which Leeper Murdered Chavez Demands Severe Punishment.**

Leeper's murder of Chavez was exceptionally cruel and gratuitous.  After having abducted Ted Sepulveda and Arlene Rodriguez at gunpoint and heard their denials of involvement in any plan to shortchange him, Leeper ordered Rodriguez, whom he had commanded to drive the rental car, to pick up Ramon Nieves Cotto at a fast-food restaurant.  PSR ¶¶ 29-30.  Leeper then directed Rodriguez to return to the area near the motel where the drug transaction had occurred, where Leeper knew that he would find Chavez.  Leeper used Rodriguez's mobile telephone to threaten to kill Chavez and others in the motel room unless Chavez came outside to the car.  Leeper's threats worked.  Once Chavez came to the car, Leeper abducted him.   PSR ¶ 31.

Leeper showed no interest in determining whether Chavez bore responsibility for Leeper being shortchanged, a task that he easily could have accomplished by reading Chavez's Facebook Messenger text exchange with the methamphetamine source, "Matthew Zimmerman" (Jose Pimentel, Jr.).  Nor did it matter to Leeper that Chavez made multiple attempts throughout the day to obtain methamphetamine or money to compensate Leeper.  While holding Chavez hostage in the back of the compact car from afternoon into night—during which time Leeper struck Chavez on the head with his handgun, causing an injury detected during the autopsy—Leeper decided to kill Chavez.  PSR ¶ 31.  Leeper first had Nieves Cotto purchase zip ties, which Leeper used to bind Chavez's ankles and wrists.  PSR ¶ 32. After doing this, and hearing Chavez beg his mother for money during a telephone call, Leeper directed Rodriguez to drive to a deserted dirt road outside of Barstow, California at the edge of the Mojave Desert, and turn off the car lights.  PSR ¶¶31-32. Leeper removed Chavez from the car and marched his victim, whose wrists remained bound with zip ties, and who apparently was barefoot, into the desert.   Leeper shot Chavez, who was

defenseless, in the back eight times at close range, emptying the magazine of the handgun in the process.  PSR ¶ 32.

Leeper's statement of responsibility to the probation officer, as described in the presentence investigation report at ¶ 49, makes no mention why Leeper murdered Chavez, who obviously posed no threat.  Leeper likely wanted to send a message to Los Angeles-area methamphetamine suppliers—people with whom Leeper hoped to (and in some cases did) conduct future drug transactions— warning them of dire consequences if they were unfair to Leeper.  Leeper's decision to maintain control over, rather than kill Arlene Rodriguez—his conduit to Los Angeles methamphetamine suppliers—supports this future business-related interpretation of Leeper's murder of Chavez.  Throughout, Leeper appeared indifferent whether Robert Chavez bore any responsibility for Leeper being shortchanged.

Although all unprovoked premeditated killings merit significant punishment, the heinous way in which Leeper held Chavez hostage throughout the day in the cramped rear hatchback area of a compact car before shooting him to death, and the absence of any mitigating explanation for the murder favor a sentence at the upper end of the agreed-upon range.

3.    **Leeper's Disturbing Criminal History Demonstrates Dangerousness Meriting a Lengthy Prison Sentence.**

Leeper's criminal record is horrific.  The two felony convictions that are assigned criminal history points—a Pennsylvania state prosecution for "Neglect of Care-Dependent Person" and "Criminal Conspiracy - Neglect of Care-Dependent Person," PSR ¶ 77, and a federal prosecution in the Middle District of Pennsylvania for "Conspiracy to Commit Health Care Fraud and Making False Statements Relating to Health Care Benefits," PSR ¶ 79—arose from Leeper's employment in 2003 to 2005 at the "Reaching Out Personal Care Home" in Lebanon, Pennsylvania, a facility operated by Leeper's mother and stepfather, Tina and Clifford Fake.  As described in the PSR at

¶ 79, this "personal care home" was, in fact, a house of horrors for "aged, sick, elderly and infirm patients" housed there.   The PSR describes "episodes of neglect and abuse, resulting in serious bodily injury [and death], affecting at least 10 of the 21 residents" at the facility.[8]

The investigation of the facility began when a resident, Jeffrey Sees, a 56-year-old disabled Vietnam veteran, was admitted to the Veteran's Administration Hospital with bruising over 60% of his body, brush burns, broken ribs, and a broken right arm, as well as lithium toxicity.   Mr. Sees, who was diabetic and had a pacemaker installed, explained that when he fell, "'Cliff [Fake] and Kyle [Leeper]' would grab him by the seat of the pants and the back of the neck or would drag him to his room."   "He further reported that he once fell, and was left alone to lay upon the floor in his own urine and defecation for approximately 14 hours."   Mr. Sees also told investigators that he was made to shovel snow and walk the owners' dogs.   PSR ¶ 79.

Other patients suffered similar or worse abuse and neglect during Leeper's employment at the facility:

- Stanley Bruzda was left untreated after breaking his leg.   He was confined to his bed and left in his own excrement.   He died in the facility;

- Kathryn Fritz was denied a diet she needed to treat constipation.   She suffered from acute bowel pain and severe constipation, which was left untreated, resulting in her hospitalization, where she died.   An autopsy showed that she had "suffered for some time

---

[8] *See also United States v. Fake*, 269 F. App'x 208, 211 (3d Cir. 2008) (summarizing the PSR from the health care fraud prosecution as describing "acts of neglect and abuse included ignoring patients' complaints of pain, verbally abusing patients, refusing to provide medical care, covering up the circumstances surrounding the death of one patient, physically assaulting patients, and failing to clean patients or provide them with sanitary living conditions.").

from bowel blockages and perforations, an acutely painful condition which had gone untreated for an extended period of time."

- Lucinda Dietz, a 56-year-old care dependent veteran, fell and broke her leg and suffered from a severe untreated bladder infection.

- Janet Weaber, a long-term resident with limited mobility, "frequently" was locked in the basement.  She reported that she received less than a half hour of care per day.

- Paul McGovern, who had multiple sclerosis, was found by police in a urine-soaked diaper that "had not been changed for an extended period of time as the urine had seeped into the upholstery of the recliner" where Mr. McGovern was seated.  He had what appeared to be dried blood on his clothing and bedding and was having seizure activity.  McGovern also had been victimized by a registered sex offender who resided at the facility.

Although the PSR does not describe Kyle Leeper being involved in the abuse and neglect of patients Bruzda, Fritz, Dietz, Weaber, or McGovern, it would defy common sense to suggest that he was unaware of how patients were treated in the small facility run by his mother and step-father, especially given Leeper's personal abuse of Jeffrey Sees and his state and federal convictions arising from his employment there.  There also was evidence that Leeper and the Fakes diverted pain medication prescribed for patients to their own use.  PSR ¶ 79 ("[W]itnesses reported that pain medications meant for patients, were diverted to the personal use of Tina and Clifford Fake and Kyle Leeper. This allegation was corroborated by care home staff and patients, and confirmed by local police searches, which found patient medications stored in Clifford Fake's bedroom and concealed in his bed.").  Obviously, this would have resulted in additional unnecessary suffering by patients.

While the Fakes and Leeper were neglecting and abusing patients at the facility, they also were committing health care fraud.  The care facility received medical benefits from several health care programs for its reported patient care, as documented in time sheets.  The government's evidence showed that Clifford "Fake and the other employees routinely falsified the time sheets, often overstating the amount of care provided, stating that hours were worked when in fact no care-giver was on duty, and covering up the substandard care and neglect suffered by the patients." *Fake*, 269 F. App'x at 211.

These past convictions reflect a disturbing level of depravity.  Leeper's involvement in the abuse and neglect of these patients, and their exploitation for the purpose of executing a fraud scheme, demonstrates that Leeper poses a significant danger to others.  This conclusion is fortified by Leeper's treatment of Robert Chavez.  Leeper's criminal history thus confirms that an imprisonment term at the upper end of the agreed-upon range is warranted.

### 4.    Leeper's Methamphetamine Trafficking Activity Merits Severe Punishment.

Leeper's murder of Chavez and Leeper's criminal past should not obscure the drug trafficking activity and illegal possession of a firearm and ammunition for which he also stands convicted.  Leeper, who had no personal ties to the Northern District of New York, was responsible for flooding the Cortland area with a highly potent form of methamphetamine, an addictive and dangerous drug.[9]  As detailed in the PSR, Leeper's business model was to obtain high-purity crystal methamphetamine in bulk in Indiana and California, bring it to Central New York, and sell it in smaller quantities at a significant price increase.  When arrested, Leeper was in possession of

---

[9] *See, e.g.*, National Institutes of Health, Press Release, "Methamphetamine-involved overdose deaths nearly tripled between 2015 to 2019, NIH study finds" (September 22, 2021), available at https://www.nih.gov/news-events/news-releases/methamphetamine-involved-overdose-deaths-nearly-tripled-between-2015-2019-nih-study-finds.

four kilograms of essentially 100% pure methamphetamine, an extremely large quantity and high purity for this part of the country.

It is noteworthy that Leeper, despite his status as a convicted felon, carried a loaded .380 caliber handgun when conducting his methamphetamine trafficking activity.  This gun, which was recovered from Leeper's truck when he was arrested, was the weapon that Leeper used to murder Robert Chavez.   Leeper also acquired a second firearm, a 9 mm pistol, on February 7, 2019, in Los Angeles when purchasing at least six pounds of methamphetamine, and made efforts to have a silencer installed on it.  During that same transaction, Leeper arranged for the future purchase of what likely was either actual or counterfeit Roxicodone tablets, a powerful prescription opioid, which were to be shipped to him in Central New York.  After returning from that trip, Leeper began to send thousands of dollars through wire transfers to Los Angeles to obtain these opioids.

There is no evidence that Leeper maintained or attempted to obtain regular legal employment at any time during the conspiracy charged in Count Two.[10]   He aspired to be a gun-carrying methamphetamine and opioid trafficker.   Until arrested, he was succeeding in this endeavor, making two trips to Indiana and two trips to California during the charged conspiracy, all for the purpose of obtaining drugs to sell in Central New York.  For this reason, as well, Leeper should be sentenced at the top end of the agreed-upon sentencing range, both to ensure community safety and to properly punish Leeper.

---

[10] It appears that Leeper had no lawful employment from 2017 until his arrest.  PSR ¶ 105.

5.   **Leeper's Disingenuous Statements to the Probation Office Show That He Has No Remorse for His Crimes.**

The presentence investigation report, in a subsection entitled "Adjustment of Acceptance of Responsibility," paraphrases Leeper's statements to the probation officer concerning his murder of Robert Chavez.  The report states:

> He [Leeper] explains he had been up for six or seven days without sleep, high on methamphetamine, and was not in his right mind when he committed the murder. He states looking back, it was not him. He is not a violent person and does not like violence. Things spiraled out of control and it ended in the murder. He wishes he could take it back and knows if he was in his right mind, he never would have done what he did. He continues to have nightmares about the murder, seeing the victim lying there and hearing him bleed out.

PSR ¶ 49.

Although the PSR does not purport to provide a verbatim account of Leeper's statements to the probation officer, government counsel is confident that the above-quoted passage is an accurate and complete description of what Leeper said when interviewed.  Leeper's statements are remarkably disingenuous and reflect no meaningful remorse for his crimes.

*"He states looking back, it was not him. He is not a violent person and does not like violence."*

This is risible.  If Leeper is "not a violent person and does not like violence," one wonders how it came to pass that he routinely carried a loaded .380 caliber handgun, including on January 17, 2019; that he abducted Arlene Rodriguez and Ted Sepulveda at gunpoint; that he threated to kill Chavez and everyone else in the motel room if Chavez did not permit himself to be kidnapped; that he pistol-whipped Chavez and later bound him with zip ties; that he shot Chavez in the back *eight times at close range* and left him face down in the desert; and that he later acquired a second handgun.  Beyond that, Leeper's professed dislike of violence is hard to square with information in the PSR that he was convicted of hitting his wife with a car and then driving away, PSR ¶ 78; that he physically abused a disabled veteran in his care, PSR ¶ 79; that he fought with police

13

officers, PSR ¶ 84; and that he beat his wife, including by breaking her feet and teeth, PSR ¶ 97, and was the subject of a protective order in her favor, PSR ¶ 96.

When returning to the Cortland, NY area after the murder, Leeper had a one-vehicle automobile accident in Western New York while driving the rental car he was using.  He arranged to have two associates bring his pickup truck to him on a flatbed trailer and exchange it for the damaged rental car.  When the vehicle exchange occurred—*at Leeper's first opportunity to speak to associates in person*—he boasted about having killed Chavez.  One of the associates, who had rented the car for Leeper based on Leeper's misrepresentation that he would use it to go to Pennsylvania, reported that during the vehicle exchange, Leeper "admitted that he went to California . . . [and] said that he had gotten ripped off out there, and he ended up having to shoot some guy and killed him . . . ."[11]  Leeper thereafter bragged about the murder to others as well.  And when Cortland County sheriff's officers detained Leeper on February 19, 2019, Leeper was combative to the point that the officers needed to deploy pepper spray to subdue him.  This is hardly the conduct of a non-violent person or one who regrets or is embarrassed by his use of violence.

### *"Things spiraled out of control and it ended in the murder."*

This "explanation"—which is devoid of any meaningful acceptance of personal responsibility for the premeditated murder of Chavez[12]—is at odds with the facts, which show that Leeper carefully controlled the events on the day of the murder.  Once Leeper realized that he had

---

[11] The government produced a transcript of the grand jury testimony of this witness to Leeper.  The government will provide a copy to the Court if it so requests.

[12] To be clear, the government is not suggesting that the Court should deny Leeper a two-level downward adjustment for acceptance of responsibility.  As the PSR notes, Leeper admitted "the factual basis for his guilty plea," PSR ¶ 49, which the government will treat as sufficient to trigger its obligation in the plea agreement to recommend the reduction.

been shortchanged, he first lured Ted Sepulveda, his initial methamphetamine contact, out of the motel room, where Leeper confronted him.  Leeper then did the same to Rodriguez, and then abducted Sepulveda and Rodriguez, and re-united with Nieves Cotto, his traveling companion and co-conspirator.  When Nieves Cotto was available for assistance, Leeper kidnapped Chavez using threats.  Leeper then orchestrated a series of events designed (with some success) to procure more methamphetamine or get his money back.  Significantly, while doing this, on two occasions—once in a parking lot in East Los Angeles and once at the Walmart store where Leeper instructed Nieves Cotto to purchase zip ties (hardly an indication that anything had "spiraled out of control")—Leeper directed Rodriguez to park out of range of store security cameras, an indication that Leeper was acting carefully and methodically.  Consistent with Leeper's command of the situation, he then bound Chavez, had Rodriguez drive down a deserted dirt road with the car headlights off, and marched Chavez into the desert, where Leeper shot and killed him.

Leeper's own words, in recorded telephone calls with his then-girlfriend Crystal Stephens, who was in jail, in the hours leading up to the murder undermine any claim that Leeper acted impulsively or that  "[t]hings spiraled out of control."  After an earlier series of calls on January 17, 2019, the following conversation occurred in a call initiated at 7:34 p.m. PST, well after Leeper had kidnapped Chavez (at around 2:30 p.m. PST) but several hours before the murder (at around 10:00 or 10:30 p.m. PST):

```
STEPHENS:   Hey. Hello? Babe. Hello? Hello? Kyle.

LEEPER:     Yes I hear you now.

STEPHENS:   Can I hea- who is this?

LEEPER:     It's me.

STEPHENS:   Oh.
```

LEEPER:      What the fuck do you want? Like I told you I'm, I'm trying take
             care of something right this minute and you call back [U/I]
             [voices overlap]

STEPHENS:    You told me to call you in an hour and a half.

LEEPER:      [coughs] I said like 2 hours but I thought I was gonna be done
             handling this shit but I'm really not. I'm almost done though.

STEPHENS:    Are you okay?
             [voices overlap]

LEEPER:      I can, you can almost have my full attention. Yeah yeah.
             Everything's fine. Gonna be fine.

*****

STEPHENS:    Where's your homeboy [Nieves Cotto]?

LEEPER:      Sittin in the back seat.

STEPHENS:    Are you with somebody right now?

LEEPER:      Yeah. [U/I] for a second.

STEPHENS:    Do you want me to call you later then?

LEEPER:      Can you?

STEPHENS:    I can.

*****

LEEPER:      Alright. Call me back in like an hour and a half.

STEPHENS:    When?

LEEPER:      It shouldn't take, it shouldn't take that long. An hour, hour and
             a half. It shouldn't take that long but just to be sure. But I
             wanna, I wanna spend my 15 minutes talking to you.

STEPHENS:    Well I can't call after 11 and it's 9:30 here. [Stephens was in
             Indiana, which is in the Central time zone, where it was two
             hours later than California.]

LEEPER:      Alright. Alright well then call me at, call me at 10:30 [CST],
             call me at 10:30 and if I'm not done dealing with my things by

```
                    then I'll make sure that I'm done dealing with it right then and

                    there.

STEPHENS:    [sighs] Okay.

LEEPER:      Alright? I love you.

STEPHENS:    Yeah. I love you too.

LEEPER:      Alright.

STEPHENS:    Alright, bye.
```

The following conversation occurred in a call that began at 8:38 p.m. PST, still before the

murder:

```
STEPHENS:    Hello?

LEEPER:      Hey babe.

STEPHENS:    Hey.

LEEPER:      Sorry.

STEPHENS:    What's going on?

LEEPER:      Nothin.

STEPHENS:    Are you okay?

LEEPER:      Yeah.

STEPHENS:    Did you get robbed?

LEEPER:      Nope. Well kinda sorta but

STEPHENS:    Huh?

LEEPER:      It's a, I'm taking care of it.

STEPEHENS:   You what?

LEEPER:      I'm taking care of it.

STEPHENS:    You're taking care of what? What'd you say before that?

LEEPER:      I said kinda. Kinda sorta but not really.

STEPHENS:    So, I hope it wasn't all your money.

LEEPER:      Nah I'm good. I'm working on it.

STEPHENS:    How are you working on it though?
```

LEEPER:      It don't matter.

STEPHENS:    LA's not the place to do that.

LEEPER:      Yeah I'm not playin either.

STEPHENS:    There's a, there's a gang on every block babe.

LEEPER:      I don't give a fuck I'm not in LA right now okay.

STEPHENS:    Ken [the name Leeper and Stephens used for Ted Sepulveda] robbed
             you?

LEEPER:      Nope. His people did though.

STEPHENS:    How much?

LEEPER:      [U/I]

STEPHENS:    A stack?

LEEPER:      Nah, way more.

STEPHENS:    Way more? Babe please tell me you didn't give em all your money.

LEEPER:      Nah, I'm good, I [U/I], I'm alright babe. [U/I] money.

STEPHENS:    Okay. How –

             [voices overlap]

LEEPER:      Okay?

STEPHENS:    Is Ken helping you?

LEEPER:      What?

STEPHENS:    Is he helping you?

LEEPER:      No.

STEPHENS:    Why?

             [voices overlap]

LEEPER:      Well, kinda, kinda, he's, um, I'm dealing with his brother now.

STEPHENS:    Dealing with his daughter?

LEEPER:      His brother.

STEPHENS:    Oh his brother. Javiar [the name Leeper and Stephens used for
             Paul Sepulveda]?

LEEPER:      What, why are you talking to me about this? What, what's the
             deal?

             [voices overlap]

STEPHENS:    Cause none of this matters here.

LEEPER:      It doesn't matter you're right.

STEPHENS:    I'm worried about you.

LEEPER:      You don't have to worry about me right now.

STEPHENS:    I can't believe you handed the money over.

LEEPER:      I know.

STEPHENS:    Baby I hope you're okay.

LEEPER:      I'm fine.

STEPHENS:    Is your homeboy [Nieves Cotto] with you?

LEEPER:      Yup.

STEPHENS:    Okay. You got me freaking out.

LEEPER:      Nah don't worry about it.

STEPHENS:    Okay.

LEEPER:      Alright?

STEPHENS:    I'm really trying not to.

LEEPER:      Everything's gonna be fine.

STEPHENS:    Okay.

*****

STEPHENS:    I don't want anything to happen to you.

LEEPER:      Alright. I don't either.

STEPHENS:    You have to be smart.

LEEPER:      I am.

STEPHENS:    Take a loss if you have to.

LEEPER:      I, nah I can't do that I'm done with that shit.

STEPHENS:    I don't even know how I'd help you come back up from this. I
             really don't.

LEEPER:      Listen you don't have to help me come back up from it cause I'm
             gonna be fine when I leave here.

STEPHENS:    I hope so.

*****

STEPHENS:    I'm not there to fuckin have your back and I don't like it.

LEEPER:      I know. I know, I, I wish you were here too. I, I don't think
             things would have been handled the way they were.

STEPHENS:    They wouldn't have. Trust me.

LEEPER:      I know.

STEPHENS:    Why is this happening?

LEEPER:      I don't know. I tried, I, I don't know.

STEPHENS:    Because before he rode up, like, it was good. Simple. [Leeper
             here is referring to an ounce-quantity drug transaction that he
             and Stephens conducted, likely in July 2018, with Edgar Arredondo
             that was arranged by Paul and Ted Sepulveda.]
             [voices overlap]

LEEPER:      Yup. Yup. Yup everything was gravy.

STEPHENS:    [sighs] I can't believe this.

LEEPER:      Listen, anytime you do anything you're taking a risk either way.

STEPHENS:    I understand that.

LEEPER:      Okay so I'm mean it's like, it, it is what it is but when I do
             bus-, when, when I do business with people it's always straight
             up, so.

STEPHENS:    I know you're always straight up. But I'm not understanding
             what's going on.

LEEPER:      You don't need to.

STEPHENS:    How are you gonna be okay?

LEEPER:      I'm gonna be fine babe I love you.

STEPHENS:    I love you too.

```
LEEPER:      Alright?

STEPHENS:    Yeah.

LEEPER:      Don't worry about it. I'll make sure you have some money this
             weekend too.

STEPHENS:    How?

LEEPER:      Listen ask your mom to put 100 bucks on your books and I'll put
             it on your books. I'll give it to your mom in the truck Sunday or
             Monday.

STEPHENS:    Are you on your way home?

LEEPER:      Not yet but I will be soon.
```

These conversations demonstrate that Leeper was in full control of events.[13]  He had a plan: "I thought I was gonna be done handling this shit but I'm really not. I'm almost done though"; and a sense of how long it would take to complete: "It shouldn't take, it shouldn't take that long. An hour, hour and a half. It shouldn't take that long but just to be sure" and "Alright well then call me at, call me at 10:30 [CST], call me at 10:30 and if I'm not done dealing with my things by then I'll make sure that I'm done dealing with it right then and there."  In the second conversation, Leeper reported that he was "dealing with" a person known to Stephens as "Javier," whose real name is Paul Sepulveda.  Telephone records and witness information show that Leeper spoke to Paul Sepulveda by telephone that evening, demanding money to compensate for his loss.  This information is consistent with Leeper's recorded conversation with Stephens and shows that rather than "things spiral[ing] out of control," Leeper remained focused on getting his money back shortly before the murder.  In the later conversation, Leeper dismissed Stephens' suggestions that he be cautious – "LA's not the place to do that . . .  There's a, there's a gang on every block babe" –  and

---

[13] The government has produced the recordings of these telephone conversation to Leeper.  Upon request, it will provide copies to the Court.

that he leave California – "Take a loss if you have to."  Leeper explained "I'm not playin either," and assured Stephens that "I'm gonna be fine when I leave here."  None of this is consistent with Leeper's claim that things had gotten out of control.

Perhaps what is most remarkable about Leeper's statement to the Probation Office is Leeper's absence of empathy for his victim, Robert Chavez, or for Chavez's family, or any acknowledgement of responsibility for Leeper's serious crimes.  Instead, Leeper distanced himself from his own wrongdoing ("He states looking back, *it was not him*." and "He wishes he could take it back and *knows if he was in his right mind, he never would have done what he did*.") and complained about how his crimes have affected *him*, not their impact on his *victims* ("He continues to have nightmares about the murder, seeing the victim lying there and hearing him bleed out.").

Leeper's disingenuous excuses for his crimes and his lack of remorse are additional reasons why a sentence at the top end of the agreed-upon range is warranted here.

### D.     Conclusion

Kyle Leeper held hostage, struck with a handgun, and callously murdered a bound and defenseless man whom he barely knew, all because Leeper had been shortchanged several thousand dollars when attempting to purchase methamphetamine, using funds he acquired by selling other methamphetamine.  Leeper committed this murder despite having reason to believe that his victim was uninvolved in the theft of Leeper's money.  At the minimum, Leeper never bothered to find out.  There is no evidence that Leeper has expressed or felt an iota of remorse for what he did to Robert Chavez or the pain he has inflicted on Chavez's family and friends.  Instead,

Leeper could not wait to brag about having killed Chavez, describing the murder to associates at his first opportunity.

Leeper's inhumane treatment of the helpless Chavez was consistent with the horrific neglect and abuse that Leeper and his parents inflicted on similarly helpless patients at the facility they operated.  Leeper's instant offenses of conviction and his past crimes together demonstrate conclusively that Leeper likely will similarly victimize others if released from prison.  The factors set out in 18 U.S.C. § 3553(a)—specifically the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[,] afford adequate deterrence to criminal conduct[, and] protect the public from further crimes of the defendant"— all heavily favor a sentence that will maximize the time that Leeper spends in prison, coupled with a supervised release term that will ensure that Leeper is subject to judicial oversight during the time, if any, that follows his prison sentence.

Respectfully submitted this 9th day of September 2022.

CARLA B. FREEDMAN
United States Attorney

Steven D. Clymer
Assistant United States Attorney
Bar Roll No. 509281

Richard R. Southwick
Thomas R. Sutcliffe
Assistant United States Attorneys